**UNITED STATES of America,
Appellee,**

v.

**Milton PARNESS and Barbara Parness,
Appellants.**

**No. 984, Docket 74–1027.**

United States Court of Appeals,
Second Circuit.

Argued April 8, 1974.

Decided June 27, 1974.

Certiorari Denied Jan. 13, 1975.
See 95 S.Ct. 775.

Roy M. Cohn, New York City (Eugene Gressman, Washington, D. C., and Michael. Rosen, New York City, on the brief), for appellants.

Bart M. Schwartz, Asst. U. S. Atty., New York City (Paul J. Curran, U. S. Atty., and S. Andrew Schaffer, Asst. U. S. Atty., New York City, on the brief), for appellee.

Before FRIENDLY and TIMBERS, Circuit Judges.*

TIMBERS, Circuit Judge:

Appellants Milton and Barbara Parness[1] appeal from judgments of con-

---

* The parties agreed in open court that these appeals would be heard and decided by a panel of two judges.

1. Unless otherwise stated, appellant Milton Parness will be referred to as Parness and appellant Barbara Parness will be referred to as Barbara or Barbara Landew, her name before her marriage to Milton Parness. Appellants were married after the acts charged in the indictment.

viction entered upon jury verdicts returned on October 3, 1973 after a thirteen day trial in the Southern District of New York before Dudley B. Bonsal, District Judge, finding them guilty on two counts of causing interstate transportation of stolen property (Counts Four and Six) and on one count of causing a person to travel in interstate commerce in furtherance of a scheme to defraud (Count Five), in violation of 18 U.S.C. § 2314 (1970); and, in addition, finding Milton Parness guilty of acquiring an enterprise affecting interstate or foreign commerce through a pattern of racketeering activity (Count One), in violation of a provision of Title IX of the Organized Crime Control Act of 1970, 18 U.S.C. § 1962(b) (1970).[2]

Of the numerous claims of error raised on appeal, we find the following to be the principal ones: (1) both appellants challenge the sufficiency of the evidence; (2) Parness claims that there was a material variance between the theory of the crime charged in Count One and the theory upon which that count was submitted to the jury; (3) Parness claims that the acquisition of a foreign corporation by means of criminal acts committed in the United States does not state an offense within the meaning of § 1962(b); and (4) Parness claims that the statute is unconstitutionally vague on its face and as applied. Questions (3) and (4) appear to be ones of first impression. Other subordinate claims of error are also raised.

We affirm.

I.

In view of the issues raised on appeal, including the challenge to the sufficiency of the evidence, the following summary of the events from the end of 1967 to the middle of 1971 which culminated in the indictment is believed necessary to an understanding of our rulings on those issues.

In 1967, Allan Goberman, a successful Pennsylvania businessman, learned of an opportunity to invest in the St. Maarten Isle Hotel Corporation, N.V. (Hotel Corp.) which owned an insolvent and partially completed hotel-casino complex on the island of St. Maarten in the Netherlands Antilles. He organized the Goberman Construction Company, N.V. and arranged for the necessary financing through American sources and later from the Antillean government with which to complete the construction of the hotel-casino in January 1970. When the complex was opened in early 1970, Goberman owned 90.5% of Hotel Corp.'s stock. He also held a $3.5 million demand note from Hotel Corp. which represented money he had loaned Hotel Corp. for construction of the complex.

The hotel was moderately successful during its first few months of operation. As the winter holiday season came to an end in early 1970, however, it became apparent that the hotel's continued financial success depended upon additional income from gambling junkets to the casino. These junkets, originating primarily in the United States, were organized by junket operators (junketeers)

2. The indictment returned August 2, 1973, which superseded an earlier one, contained seven counts. In Counts One, Two and Three, Parness was charged with acquiring three separate enterprises through patterns of racketeering activity, in violation of 18 U.S.C. § 1962(b) (1970). Counts Four through Seven charged both defendants, in violation of 18 U.S.C. § 2314 (1970), with crimes alleged to constitute the individual acts of racketeering which formed the pattern of racketeering charged in Counts One through Three.

The trial began on September 12 and concluded on October 3, 1973 when the jury returned a verdict finding both defendants guilty on Counts Four, Five and Six and Parness guilty on Count One. Counts Two, Three and Seven were dismissed at the close of the government's case.

On December 7, Parness was sentenced to concurrent ten year terms of imprisonment on each of the four counts and was fined a total of $55,000. He has been enlarged on bail pending appeal. Barbara was sentenced to concurrent two year terms of imprisonment on each of Counts Four, Five and Six and was fined a total of $6,000; execution of her sentences of imprisonment was suspended and she was placed on probation for three years.

who arranged for a group of prospective gamblers to be flown to St. Maarten and to be provided with accommodations at the hotel, all free of charge.

Each junket participant prior to his departure from the United States was required to deposit gambling "front money" with the junketeer. If his losses at the casino exceeded his initial stake, he was permitted to gamble on credit. These credit advances were evidenced by signed IOU's, commonly known as markers. When a player was unable to recoup his losses and thereby redeem his markers prior to his return to the United States, it was the responsibility of the junketeer to collect such debts and to remit the proceeds, less a commission, to Hotel Corp. The junketeer also was responsible for forwarding the front money to Hotel Corp.

In mid-1970, Goberman first met Parness, a junketeer who had been arranging successful junkets to the casino for some time through his corporation, Olympic Sports Club, Inc. In the fall of 1970, Goberman offered Parness the exclusive right to manage and direct junkets to the hotel-casino. Parness accepted. Thereafter all such junkets were arranged through Parness and Olympic. Beginning in late 1970 and continuing until his eventual acquisition of Goberman's interest in Hotel Corp., Parness assumed sole responsibility for collecting all of the hotel's outstanding marker receivables. During the same period, Olympic's sole function was arranging gambling junkets to the hotel. Almost its only income was from gamblers' front money and marker collections.

Despite the income from the gambling junkets, Hotel Corp. began to experience serious financial difficulties within a few months of the opening of the hotel-casino. In order to continue operations until permanent financing could be arranged, Goberman on October 6, 1970 obtained from Leonard Holzer of New York City a short term $150,000 loan (the Holzer loan). Goberman signed a promissory note in this amount, secured by a pledge of his entire 226,500 share interest in Hotel Corp. Goberman advanced virtually the entire $150,000 to Hotel Corp. Parness knew of the Holzer loan and of the hotel's financial straits.

In late 1970, Holzer began to threaten Goberman with foreclosure on the stock pledge unless the loan was immediately repaid. In order to obtain the necessary funds with which to repay the loan, Goberman repeatedly asked Parness for approximately $400,000 in overdue marker receivables which Parness claimed he had not yet been able to collect. Because these funds were not forthcoming from Parness or Hotel Corp., Goberman was unable to repay the loan. Holzer called the loan and on January 25, 1971 began foreclosure proceedings on Goberman's stock interest in Hotel Corp.

Shortly before Goberman's Hotel Corp. stock was to be sold at auction on February 4, 1971, Parness told Goberman that, although the outstanding markers were still uncollectible, he had arranged to borrow $150,000 and would advance that sum to Goberman to enable him to repay the Holzer loan. Parness told Goberman that the lenders had demanded that Goberman again pledge his entire interest in Hotel Corp. At Parness' direction, Goberman signed a loan agreement with two Parness nominees, Barbara Landew (Parness) and one Stanley Amsterdam, pursuant to which he was to receive $160,000 [3] (the Goberman loan). Neither Barbara nor Amsterdam had supplied any of the funds loaned to Goberman. Amsterdam signed the agreement only as a favor to Parness.

On February 4, Barbara went to a bank in West Orange, New Jersey, and, with $99,000 in cash and a $56,000 check drawn on Olympic's account, purchased two cashier's checks.[4] These were to be used by Goberman to repay the Holzer loan. Later the same day, Parness ar-

---

3. The $160,000 represented the $150,000 principal of the Holzer loan, plus $5,000 in accrued interest and $5,000 for Holzer's attorney's fees.

4. The cashier's checks were in the amounts of $150,000 and $5,000, representing the principal and accrued interest on the Holzer loan.

ranged for Goberman, his attorney and Holzer's attorney to meet in Manhattan. From there they went to the New Jersey bank and picked up the cashier's checks which Barbara had left there. On February 9, again using Olympic funds, Barbara purchased another $5,000 cashier's check at the same bank and forwarded it to Holzer's counsel in New York as legal fees.[5]

During February and March of 1971, Goberman continued his efforts to obtain from Parness the $400,000 in unremitted marker receivables. Because this money was still not forthcoming and allegedly because Goberman was denied access to other funds which Parness had remitted to Hotel Corp., he was unable to repay Barbara and Amsterdam. They, at Parness' direction, prepared to exercise their rights under Goberman's latest pledge of his Hotel Corp. stock. On April 3, Parness' counsel drafted, and Goberman, Barbara and Amsterdam executed, a number of documents bearing various dates and purportedly prepared over a period of time in the ordinary course of business, the end result of which was that Goberman was formally divested of his 226,500 shares of Hotel Corp. stock.

Shortly thereafter, Parness acquired Aliter Holdings, N.V., a shell Antillean corporation. He did so through his cousin, Edward Levrey. On June 10, Barbara and Amsterdam transferred "their" interest in Hotel Corp. to Aliter. In a letter purportedly written by Levrey, Aliter acknowledged receipt of the stock. The letter also sought to establish that Aliter had provided the funds for the Goberman loan and that Barbara and Amsterdam had acted as its agents throughout. Aliter in fact had supplied no funds to Barbara or Amsterdam and had not even been an active corporation at the time the Goberman loan was made.

During the summer of 1971, Parness, again using Levrey as a front, acquired Terrasol Holdings, N.V., another shell Antillean corporation. Terrasol then exchanged its common stock for Aliter's holdings in Hotel Corp. In November, Parness attempted to make a public offering of Terrasol common stock in Canada. The prospectus, prepared at Parness' direction, falsely described Terrasol as a Levrey family corporation and falsely represented that Levrey had purchased the 226,500 shares of Hotel Corp. stock from Goberman for $150,000 in cash. Levrey in fact had invested no funds in either Aliter or Terrasol and had had no financial dealings with Goberman.

## II.

In challenging the sufficiency of the evidence, appellants claim that the government failed to establish that the cashier's checks, which they caused to be transported in interstate commerce, represented converted marker proceeds. They contend therefore that the evidence was insufficient to support their convictions of the crimes charged under § 2314 (Counts Four and Six) [6] and that it was likewise insufficient to support a finding of two indictable acts on which to predicate Parness' conviction under § 1962(b) (Count One). Barbara also claims that, even if the funds were unlawfully withheld, there was no evidence that she knew of it and therefore no basis for her conviction as an aider and abettor. Viewing the evidence in the light most favorable to the government, United States v. McCarthy, 473 F.2d 300, 302 (2 Cir. 1972), we hold that each of these claims is without merit.

---

5. The interstate transportation of the two cashier's checks on February 4, Goberman's interstate travel on the same day, and the February 9 interstate transportation of the additional $5,000 cashier's check constitute the violations of § 2314 charged in Counts Four, Five and Six, respectively. They also constitute the pattern of racketeering activity, in violation of § 1962(b), charged in Count One.

6. Proof of conversion of marker collections was not required for conviction on Count Five which charged appellants under paragraph 2 of § 2314 with causing Goberman to travel interstate on February 4 in furtherance of the scheme to defraud him of his interest in Hotel Corp.

True, the government did not trace the proceeds of particular marker collections from specific gambler-debtors through Parness and Olympic to Goberman in the form of a loan. Given the nature of the enterprise involved, the absence of such evidence is not surprising,[7] nor is it fatal to the government's case. There was evidence that Parness was' in a position to have collected and to have withheld substantial amounts of marker receipts. There also was evidence of numerous and flagrant efforts by Parness and Barbara to conceal both the source of the funds and the interest of Parness in the various transactions. From this and other evidence the jury was warranted in finding the requisite nexus between the money due Hotel Corp. and the Goberman loan. In short, there was ample circumstantial evidence from which the jury reasonably could find the requisite theft or conversion.

The record establishes that Hotel Corp. failed to receive approximately $400,000 in overdue marker accounts payable during a period when Parness was solely responsible for and had exclusive control over marker collections. Parness thus had access to vast sums of money due Hotel Corp. and a clear opportunity to have concealed collections and to have withheld the proceeds.

The record further shows that Olympic derived its income almost exclusively from junket front money and marker collections. From this the jury was entitled to infer that the two Olympic checks totalling $61,000, which Barbara used on February 4 and 9 to purchase the cashier's checks, represented the proceeds of unremitted marker collections. The efforts of Parness and Barbara to conceal the use of Olympic funds in connection with the Goberman loan tend to buttress this inference. The two Olympic checks initially were reflected on the corporation's disbursements ledger as air fare payments to a travel agency with which Barbara was associated. Actually no such payments were ever made. Parness later described these sums as "redeposits" of Olympic funds. Not until the summer of 1972, after the government had begun its investigation into the takeover of Hotel Corp., did Parness acknowledge to his accountant that the money had been loaned to Goberman. In a further attempt to conceal Olympic's role in the acquisition of Hotel Corp., Barbara testified falsely before the grand jury investigating the takeover that it was Levrey who had provided $150,000 *in cash* to be used for the Goberman loan. Plainly she knew that Olympic checks were used and that Levrey had not supplied the funds. From these and other attempts to cover up Olympic's participation, the jury was warranted in finding that Parness and Barbara concocted a scheme to avoid the suspicions which would have stemmed from knowledge that the funds for the Goberman loan had come from a corporation which derived its income from casino receipts and which had failed to remit substantial sums due Hotel Corp.

There also was ample evidence to support the inference that the $99,000 in cash used on February 4 to enable Goberman to repay the Holzer loan represented money due Hotel Corp. The Holzer loan was repaid at a time Parness was making substantial marker collections. Shortly before the Goberman loan, as noted above, agents of the Internal Revenue Service seized $60,000 in cash marker collections intended for Parness. The jury reasonably could have found that this seizure precipitated the cover-up of Olympic's participation. But for such an unexpected occurrence, Parness would have had sufficient cash with which to have consummated the Goberman transaction undetected. Had such cash been available, Parness need not have resorted to the more easily traceable Olympic checks, and the cover-up would have been unnecessary.

---

7. Markers often were paid in cash by carriers for the gambler-debtors. In late January 1971, agents of the Internal Revenue Service intercepted such a carrier and seized $60,000 in cash marker collections intended for Parness.

But the deception went further. In addition to the efforts to conceal Olympic's role in Parness' scheme to acquire Hotel Corp., there was evidence that Parness resorted to similar schemes· to disguise his own personal involvement in the Goberman loan and the subsequent clandestine corporate transactions.[8] He used nominees in the loan agreement itself. He used a straw man in connection with his acquisition of Aliter and Terrasol. And he had documents prepared which falsely represented that first Aliter and then Levrey had provided the funds used to acquire Hotel Corp.

██ The government adduced overwhelming evidence which disproved each of these false representations, as well as evidence which exposed the implausibility of explanations offered by Parness for other false representations. The jury surely was justified in concluding that all were part of Parness' scheme to cover up his conversion of money due Hotel Corp. In short, in the context of this record and in view of the complete absence of any credible explanation[9] as to the source of funds used in connection with the Goberman loan, we fail to see how the jury could have reached any conclusion except that Parness had withheld marker collections and had used the proceeds of such collections and the front money to acquire Goberman's interest in Hotel Corp.[10] As we recently stated in United States v. Frank, 494 F.2d 145, 153 (2 Cir. 1974):

"[T]he defendants were not required to testify or to present any case at all, and the jury could not permissibly draw an adverse inference simply from their failure to take the stand. But the self-incrimination clause does not elevate a defendant's silence, . . . to the level of a convincing refutation. When a defendant has offered no [credible explanation], it may be reasonable for a jury to draw inferences from the prosecution's evidence which would be impermissible if the defendant had supplied a credible exculpatory version . . . . "

Cf. United States v. Sheiner, 410 F.2d 337, 340 (2 Cir.), cert. denied, 396 U.S. 825 (1969).

We also reject Barbara's claim that the evidence was insufficient to support her conviction as an aider and abettor. Her active involvement in virtually every aspect of Parness' scheme to acquire Hotel Corp. and the subsequent cover-up warranted the jury in finding that she had associated herself with the venture and had sought to make it succeed. Nye & Nissen Corp. v. United States, 336 U.S. 613, 619 (1949), quoting in part from United States v. Peoni, 100 F.2d 401, 402 (2 Cir. 1938) (L. Hand, J.); United States v. Manna, 353 F.2d 191, 192 (2 Cir. 1965), cert. denied, 384 U.S. 975 (1966).

██ It is not an overstatement to characterize the evidence of Barbara's participation as overwhelming. She purchased the cashier's checks used in

---

8. Parness also sought to conceal his interest in Olympic itself. He executed corporate documents in the name of Edward Feldman without the latter's knowledge. Later he tried to persuade Feldman to testify falsely at trial that he had authorized Parness to use his name.

9. Neither appellant testified at trial. The only witnesses called by the defense were John Blandino, the executive assistant manager at the hotel in 1970, and Larry Faigin, Esq., the attorney who represented Holzer in the Goberman transaction.

10. Relying on Griffin v. California, 380 U.S. 609 (1965), appellants argue that the

prosecutor's reference in his summation to the lack of any credible explanation as to the source of the funds constituted an impermissible comment on their failure to produce evidence or to testify on their own behalf. Read in context, we hold that the prosecutor's remarks constituted fair comment on the weakness inherent in the entire defense case and not improper comment upon appellants' silence. See United States v. Dioguardi, 492 F.2d 70, 82 (2 Cir. 1974); United States v. Lipton, 467 F.2d 1161, 1168 (2 Cir. 1972), cert. denied, 410 U.S. 927 (1973).

connection with the Goberman loan. She stated to the person who accompanied her to the bank on February 4 that she was arranging for the takeover of a hotel. She allowed her name to be used in the loan agreement. She participated in executing on April 3 the bogus documents by which Goberman was formally divested of his stock. She acquiesced in the transfer without consideration of "her" interest in Hotel Corp. to Aliter.

Moreover, she testified falsely before the grand jury that Levrey had furnished $150,000 in cash to be used for the Goberman loan. It is axiomatic that exculpatory statements, when shown to be false, are circumstantial evidence of guilty consciousness and have independent probative force. United States v. Lacey, 459 F.2d 86, 89 (2 Cir.), cert. denied, 409 U.S. 860 (1972); United States v. DeAlesandro, 361 F.2d 694, 697–98 (2 Cir.), cert. denied, 385 U.S. 842 (1966). This rule has especially compelling application here, for Barbara's false testimony tended not only to conceal her own participation in the transfer of the stolen funds but furthered the cover-up initiated by her husband.

### III.

Parness claims that his conviction under § 1962(b) must be reversed because there was a material variance between the theory of the crime charged in Count One and the theory upon which that count was submitted to the jury. We hold that, if there was error at all in this respect, it was harmless beyond a reasonable doubt.

Count One charged Parness under § 1962(b), among other offenses, with acquiring Goberman's interest in Hotel Corp. through a pattern of racketeering activity involving the conversion and interstate transportation of marker proceeds. The evidence established that Parness gained control of Hotel Corp. by (1) withholding funds due Hotel Corp., (2) loaning a portion of these funds to Goberman, and (3) thereafter preventing him from repaying the loan by continuing to conceal marker collections and by denying him access to other funds which Parness had remitted. Parness claims that this latter "remittal-deprivation" scheme was not charged in the indictment. He argues that the district court, in instructing the jury to consider it, in effect sanctioned an amendment of the indictment and permitted the jury to convict him of a crime not charged.

In our view, even if the jury did consider the so-called "remittal-deprivation" evidence and assuming such evidence was not precisely within the literal scope of the allegations of the indictment, that could have had no effect whatever on his conviction under § 1962(b). Parness was charged with and convicted of three separate violations of § 2314. Counts Four and Six charged interstate transportation of cashier's checks on February 4 and 9. Count Five related to Goberman's interstate travel on February 4. Convictions on any two of these counts were sufficient under § 1961(5) to establish the "pattern of racketeering activity" necessary for a conviction under § 1962(b). In order to find Parness guilty on Counts Four and Six, the jury was required to find only that he converted marker collections and caused the proceeds to be transported in interstate commerce. Whether Goberman at some later date may or may not have been denied access to remitted funds has no bearing on such a finding. Parness' convictions on Counts Four and Six were unaffected by the jury's alleged consideration of the "remittal-deprivation" evidence. Such convictions provide sufficient predicates for his conviction under § 1962(b).

### IV.

Parness claims that, in enacting Title IX of the Organized Crime Control Act of 1970, 18 U.S.C. § 1961 et seq. (1970), of which § 1962(b) is a part, Congress did not intend to proscribe the acquisition of foreign businesses by means of criminal conduct committed in the United States despite the impact on

domestic commerce. Specifically, he argues that his take-over of Hotel Corp., an Antillean corporation, cannot be said to constitute an offense under § 1962(b) because Hotel Corp. is not an "enterprise" within the meaning of the Act. This argument is predicated upon an unreasonably narrow interpretation of the statute and is refuted by the language and legislative history of § 1962 (b).

■ Section 1962(b) proscribes the acquisition of "any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." [11] "Enterprise" is defined in § 1961(4) to include "any . . . corporation". On its face the proscription is all inclusive. It permits no inference that the Act was intended to have a parochial application. The legislative history, moreover, strongly indicates the intent of Congress that this provision be broadly construed. For example, the House Report on § 1962 states that:

"*any acquisition* meeting the test of subsection (b) is prohibited *without exception.*" (emphasis added) [12]

We find Parness' claim unpersuasive for yet another reason. It presupposes that in enacting § 1962(b) Congress intended to focus exclusively upon the enterprise acquired and sought to protect only American institutions. There is no indication that the statute was meant to have such a limited remedial scope. On the contrary, its legislative history leaves no room for doubt that Congress intended to deal generally with the influences of organized crime on the American economy and not merely with its infiltration into domestic enterprises.

In its Statement of Findings and Purpose, by way of preface to Title IX, Congress made clear its concern for American investors and businessmen, as well as American institutions:

"(1) organized crime in the United States . . . annually drains billions of dollars from America's economy by unlawful conduct . . . ; (4) organized crime activities . . . weaken the stability of the Nation's economic system, harm innocent investors . . . and undermine the general welfare of the Nation and [American] citizens; . . ." [13]

Moreover, the provisions of §§ 1963 and 1964 for broad civil remedies to victims of such infiltration further indicate the intent of Congress to protect the individual, as well as the "enterprise".

In short, we find no indication that Congress intended to limit Title IX to infiltration of domestic enterprises. On the contrary, the salutary purposes of the Act would be frustrated by such construction. It would permit those whose actions ravage the American economy to escape prosecution simply by investing the proceeds of their ill-gotten gains in a foreign enterprise. We reject any such construction.

Parness nevertheless advances an argument based on cases arising under the Labor Management Relations Act, 29 U.S.C. § 141 et seq. (1970). They deal with labor disputes involving alien

---

11. We reject out of hand the claim that the activities of Hotel Corp. did not have the requisite effect on interstate or foreign commerce. It was owned by Goberman, an American citizen. It was financed by Pennsylvania banks and Massachusetts businessmen. It had numerous domestic creditors. It served primarily American tourists. And its accounts were payable in U.S. dollars to Olympic, a New Jersey corporation.

12. H.R.No.1549, 91st Cong., 1st Sess. (1970), quoted in 2 U.S.Code Cong. & Admin.News 4033 (1970).

Indeed, Congress clearly intended that Title IX as a whole "be liberally construed to effectuate its remedial purposes." Pub.L.No. 91–452 § 904 (1970).

13. Pub.L.No.91–452 § 1 (1970).
The floor debate on the Act further indicates the concern of Congress in protecting the American economy as a whole. E. g., 115 Cong.Rec. 5874 (1969) (remarks of Senator McClellan); 116 Cong.Rec. 35193 (1970) (remarks of Congressman Poff); 116 Cong.Rec. 35327 (1970) (remarks of Congressman Randall).

staffs aboard foreign flag vessels operating in United States territorial waters. E. g., Windward Shipping (London) Ltd. v. American Radio Assn., 415 U.S. 104 (1974); McColloch v. Sociedad Nacional, 372 U.S. 10 (1963). Parness argues that we cannot apply § 1962(b) to his acquisition of Hotel Corp. unless "the affirmative intention of Congress [is] clearly expressed." Benz v. Compania Naviera Hidalgo, 353 U.S. 138, 147 (1957). His reliance on this line of cases is misplaced.

First, the rather obvious proposition for which these cases stand is simply that a court should consider the legislative history of a statute to determine its applicability to a given factual situation. International Longshoreman's Local 1416 v. Amdriadne Shipping Co., 397 U.S. 195, 198–200 (1970). Having done so here, we have concluded that Congress intended to make criminal the acquisition of any "enterprise" having the requisite nexus with interstate or foreign commerce if done in the manner proscribed by the statute.

Secondly, the *Benz-McColloch-Windward* line of cases involved the exercise of American sovereignty—here, in the context of American labor law—in a regulatory area in which international comity is traditional. Windward Shipping (London) Ltd. v. American Radio Assn., *supra*, 415 U.S. at 112–13; McColloch v. Sociedad Nacional, *supra*, 372 U.S. at 21. These cases presented difficult issues in the "delicate field of international relations". Benz v. Compania Naviera Hidalgo, *supra*, 353 U.S. at 147. In view of this potential for international discord and retaliation, the Supreme Court was reluctant to apply regulatory provisions of the LMRA to foreign flag vessels and alien seamen in the absence of a clear Congressional directive.

Title IX, by way of contrast, in no way involves regulation of the internal affairs of enterprises subject to the sovereign power of foreign states. The application of § 1962(b) here cannot conceivably endanger American foreign relations. The statute simply provides federal law enforcement agencies with the tools with which to combat organized crime in the United States.

Finally, we are not breaking new ground in applying federal criminal sanctions to activities involving both American and foreign contacts, as Parness suggests. The Sherman Act, 15 U.S.C. § 1 et seq. (1970), has been held to proscribe conspiracies in restraint of trade which are entered into in the United States but carried out both here and abroad, assuming the requisite effect on commerce. E. g., United States v. Sisal Sales Corp., 274 U.S. 268, 276 (1927); cf. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 704–06 (1962). And, in dealing with one of the antifraud provisions of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1970), we have held that, where there is substantial United States activity and Americans are hurt, it is immaterial that the corporation is foreign. Leasco Data Processing Equipment Corp. v. Maxwell, 468 F.2d 1326 (2 Cir. 1972).[14]

## V.

■ Finally, relying on Papachistou v. City of Jacksonville, 405 U.S. 156, 162 (1972), and United States v. Petrillo, 332 U.S. 1, 8 (1947), Parness claims that § 1962(b) is unconstitutionally vague on its face and as applied. He asserts that the statute failed to convey to him a sufficiently definite warning as to the proscribed conduct.

Section 1962(b) provides in relevant part as follows:

"It shall be unlawful for any person through a pattern of racketeering activity . . . to acquire . . .

---

14. We note that § 2314, violations of which provide the predicates for Parness' conviction under § 1962(b), has been held to apply to the transportation of foreign securities stolen in a foreign country. United States v. Greco, 298 F.2d 247, 251 (2 Cir.), cert. denied, 369 U.S. 820 (1962).

any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

"Racketeering activity" as charged in the instant indictment is defined in § 1961(1)(B) as "any act which is indictable under any of the following provisions of title 18, United States Code: . . . [section] 2314 (relating to interstate transportation of stolen property) . . . ." Under § 1961(5), a "pattern of racketeering activity" requires at least two such acts. Thus, as applied here, § 1962(b) proscribes the acquisition of any interest in any enterprise affecting interstate or foreign commerce resulting from at least two acts which are indictable under § 2314.

Despite what strikes us as the clarity of this statutory proscription, Parness claims that Congress committed a fatal error in defining "racketeering activity" in terms of an "act which is indictable under", rather than one which violates, the incorporated criminal statutes. He argues that, since he could not have known at the time he made his "investment" whether he would be indicted for the predicate § 2314 offenses, the statutory warning that his acquisition of Hotel Corp. would violate § 1962(b) was constitutionally inadequate.

■ Parness' argument presupposes that indictment under § 2314 is a condition precedent to a § 1962(b) prosecution. There is no such statutory requirement. A § 1962(b) offense is predicated in turn upon certain other specified criminal offenses, the constitutionality of which is not challenged. Section 1962(b) creates a separate and wholly independent crime. As with other federal criminal statutes; violation of which is dependent upon proof of another crime, e. g., the Travel Act, 18 U.S.C. § 1952 (1970), and the Gun Control Act, 18 U.S.C. § 921 et seq. (1970), prosecution under § 1962(b) does not require that the predicate offenses must previously have been charged. Cf. United States v. Nardello, 393 U.S. 286, 293–96

(1969) . (Travel Act); United States v. Ramirez, 482 F.2d 807, 813–14 (2 Cir.), cert. denied, 414 U.S. 1070 (1973) (Gun Control Act); United States v. Sudduth, 457 F.2d 1198, 1201 (10 Cir. 1972) (Gun Control Act); United States v. Rizzo, 418 F.2d 71, 74 (7 Cir. 1969), cert. denied, 397 U.S. 967 (1970) (Travel Act).

To convict Parness under § 1962(b), the prosecution was required to establish only that he acquired his interest in Hotel Corp. through two or more § 2314 violations. That he may have been uncertain as to whether he would be indicted for the predicate offenses is irrelevant to the adequacy of the warning of the risk of criminality conveyed by § 1962 (b).

■ Parness claims that the phrase "pattern of racketeering activity", although clearly defined as "at least two acts of racketeering activity", is unconstitutionally vague as applied. He argues that, since he was charged under § 1962(b) with devising a scheme to acquire Goberman's interest in Hotel Corp. through a "pattern" of § 2314 offenses and since § 2314 proscribes interstate transportation in furtherance of a scheme to defraud, he could not have known whether two indictable § 2314 offenses referred to .two fraudulent schemes or two acts of interstate transportation pursuant to a single scheme. This claim rests upon a misinterpretation of § 2314.

■ The indictment charged Parness with three acts, each of which constituted a separate § 2314 offense. The interstate transportation of the cashier's checks on February 4 and 9 constituted two such acts (Counts Four and Six), and Goberman's interstate travel on February 4 a third (Count Five). Proof that the criminal conduct was in furtherance of a scheme to defraud was an essential element of the offense charged in Count Five only. To establish the offenses charged in Counts Four and Six, the government was required to establish only that Parness knowingly caused converted marker collections to be trans-

**442**

ported in interstate commerce. It did so. Accordingly, assuming arguendo that the claimed ambiguity under other circumstances might be said to exist, there is no such possibility here. The constitutional validity of a statute does not depend upon whether there are marginal cases in which its clarity may be in doubt. United States v. Petrillo, *supra,* 332 U.S. at 7; Robinson v. United States, 324 U.S. 282, 285–86 (1945); United States v. Manfredi, 488 F.2d 588, 603 (2 Cir. 1973), cert. denied, 417 U.S. 936 (1974). Rather, the test is whether the statute conveys an adequate warning as applied in a specific situation. E. g., Williams v. United States, 341 U.S. 97, 104 (1951); United States v. Deutsch, 451 F.2d 98, 113–14 (2 Cir. 1971), cert. denied, 404 U.S. 1019 (1972). Here, the interstate transportation of the two cashier's checks clearly were acts indictable under § 2314. They provided unambiguous predicates for the § 1962(b) "pattern".

We reject Parness' claim that § 1962(b) is unconstitutionally vague on its face and as applied.

We have considered appellants' other claims of error and find them to be without merit.

Affirmed.