The **PROCTER & GAMBLE COMPANY**
and Riverview Productions, Inc.,
Plaintiffs–Appellants,

v.

**BIG APPLE INDUSTRIAL BUILDINGS, INC.,** Arol I. Buntzman, Martin William Halbfinger, Esq., George A. Fuller Company, the Arkhon Corporation, Haines Lundberg Waehler, and John Does 1–10, Defendants–Appellees.

No. 37, Docket 87–7324.

United States Court of Appeals,
Second Circuit.

Argued Sept. 18, 1987.

Decided June 22, 1989.

---

Harold P. Weinberger (David S. Frankel, Kramer, Levin, Nessen, Kamin & Frankel,

New York City, of counsel), for plaintiffs-appellants.

Robert Polstein (Anthony J. Ferrara, Polstein, Ferrara & Campriello, New York City, of counsel), for defendants-appellees Big Apple Indus. Buildings, Inc., Arol I. Buntzman and Martin William Halbfinger, Esq.

Ray Goddard (Robert J. Miletsky, Max E. Greenberg, Cantor & Reiss, New York City, of counsel), for defendant-appellee George A. Fuller Co.

Martin I. Shelton (Shea & Gould, New York City, of counsel), for defendant-appellee The Arkhon Corp.

Thomas J. McGowan (Frank L. Amoroso, Rivkin, Radler, Dunne & Bayh, Uniondale, N.Y., of counsel), for defendant-appellee Haines Lundberg Waehler.

Before CARDAMONE, WINTER and MINER Circuit Judges.

CARDAMONE, Circuit Judge:

In *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 500, 105 S.Ct. 3275, 3287, 87 L.Ed. 2d 346 (1985), the Supreme Court challenged Congress and the lower federal courts to develop a "meaningful concept" of the quintessential insignia of a violation of the Racketeer Influenced and Corrupt Organizations Act (RICO)—"pattern of racketeering activity." The Court provided some instruction in its oft-quoted footnote 14. *Id.* at 496, 106 S.Ct. at 3285. The problem is of serious consequence because a RICO trial often becomes a "megatrial" with large numbers of unrelated defendants—charged with unconnected wrongs—tried together under the rubric of a single conspiracy. A RICO conviction subjects a defendant to a possible 20–year prison term and a fine of $25,000. 18 U.S. C. § 1963(a). In two recent cases considered and decided *en banc*, we accepted the Supreme Court's challenge. *See Beauford v. Helmsley*, 865 F.2d 1386 (2d Cir. 1989) (*en banc*); *United States v. Indelicato*, 865 F.2d 1370 (2d Cir.1989) (*en banc*).

The present appeal was argued a considerable time ago on September 18, 1987. Decision has been delayed awaiting the res-olution of the two above *en banc* cases that were decided on January 13, 1989. Subsequently, the parties, at our suggestion, re-briefed the instant appeal in March 1989 in light of *Beauford* and *Indelicato*.

## BACKGROUND

The facts alleged in plaintiffs' complaint relate to the lease and construction of the "Riverview Studio Complex," a high-tech television and motion picture production facility. In 1983, plaintiff the Procter & Gamble Company (P & G) and its advertising agency D'Arcy Masius Benton & Bowles, Inc. (Benton & Bowles) began looking for new studio space for the production of P & G's three soap operas. After considering at least eight sites in the New York metropolitan area, their search settled on the Washburn Wire Factory, an abandoned manufacturing plant located in Manhattan between East 116th and 119th Streets and owned by defendant Big Apple Industrial Buildings, Inc. (Big Apple). Defendant Arol Buntzman, president of Big Apple, and his attorney, defendant Martin W. Halbfinger, approached P & G with a plan to convert the factory into a state-of-the-art production complex, misrepresenting Big Apple's experience and expertise in conducting major renovation projects and exaggerating the completed site's potential as a tourist attraction.

During the course of negotiations beginning in the spring of 1984 Buntzman repeatedly stated that "hard" construction costs would not exceed $18 million and that the total project would cost approximately $25 million. The $18 million figure was supported by a letter Buntzman had received from the proposed general contractor, defendant George A. Fuller Co. (Fuller), estimating actual construction costs at $17,612,000. It later turned out that Fuller made this estimate simply by multiplying costs per square foot of comparable projects by the subject project's approximate square footage. Fuller did not determine actual construction costs based upon plans and specifications for building the project on this site. Hence, the estimate was unrealistic.

In January 1985, plaintiff Riverview Productions, Inc. (Riverview)—a wholly-owned subsidiary of Benton & Bowles formed to act for P & G in the studio project and whose obligations P & G guaranteed—entered into a ten-year lease and lease guaranty with Big Apple. The lease was for the three as yet unbuilt studios—the Riverview Studio Complex—at an annual rental of $1.2 million, plus Big Apple's annual debt service, including amortization over ten years of a loan for the entire construction cost of the project. As the transaction was originally structured, Big Apple as owner was to obtain a construction loan based on P & G's lease guaranty, but P & G and Riverview were to have no further role in securing construction financing.

Nonetheless, because Big Apple had difficulty obtaining a construction loan, it asked P & G to guarantee the loan. P & G initially refused. Meanwhile, Riverview was pressing Big Apple for more precise cost estimates. Plaintiffs allege that when Fuller conducted a more thorough cost survey and placed "hard" construction costs in the vicinity of $40 million, Big Apple squelched this estimate and hired an outside consultant who—on the basis of inaccurate information—computed "hard" costs at $22.7 million. At that time, Buntzman as head of Big Apple assured P & G and Riverview that their resulting calculation of $30–35 million for the project's total cost was too high. On the basis of the new $22.7 million "hard" cost figure, P & G eventually agreed to guarantee the construction loan.

In a June 6, 1985 "Tri–Party Agreement" between P & G, Riverview, and Big Apple, P & G agreed to guarantee financing up to $25 million to be provided by Citibank N.A. ($22 million in "hard" costs, $3 million in "soft" costs). The $25 million limit was reached in early 1986. Thereafter, P & G extended its guaranty on a requisition-by-requisition basis until April 1986, when the loan totalled $32 million. Throughout the months of financing, Big Apple continued to mislead plaintiffs regarding the Riverview Studio Complex's actual costs and to conceal the second, more accurate Fuller estimate.

On May 2, 1986 plaintiffs P & G and Riverview filed a complaint asserting various state law causes of action for fraud and conversion as well as violation of the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. §§ 1961–1968 (1982 & Supp. IV 1986). The RICO defendants are Big Apple, Halbfinger, Buntzman, and Fuller. Plaintiffs' claims against Haines Lundberg Waehler, an architectural, engineering, and planning firm, allege essentially architectural malpractice; plaintiffs charge the Arkhon Corporation, a construction manager of building projects, with breach of its management contract and of an implied warranty. Plaintiffs seek treble damages based on the RICO violations and rescission of the Lease, the Lease Guaranty, and the Tri–Party Agreement.

In addition to alleging that the RICO defendants fraudulently convinced plaintiffs to lease and guarantee financing for the studio complex, plaintiffs accuse the RICO defendants of repeated illegal siphoning of project funds. Plaintiffs allege that Big Apple improperly and excessively requisitioned millions of dollars over a nine-month period, including $657,000 in fees and disbursements to Halbfinger for 13 months' legal services, a $625,000 construction manager's fee to defendant Arkhon Corporation, and other excessive, duplicative, or unauthorized expenditures. Moreover, defendants Big Apple and Halbfinger are claimed to have fraudulently abused escrow accounts by inflating requisitions in order to "cushion" them against the possibility that plaintiffs would detect their fraud. Finally, plaintiffs contend that defendants repeatedly and falsely blamed P & G and Riverview for construction delays so that they could justify charging "interim rent" for unproductive periods.

On motions to dismiss the complaint under Fed.R.Civ.P. 9(b), 12(b)(1), and 12(b)(6), Judge Leval of the United States District Court for the Southern District of New York ruled that the alleged racketeering activity was not sufficiently continuous or related to constitute a RICO violation. Because the RICO claim was the only basis for federal jurisdiction, Judge Leval dismissed the complaint without prejudice to

permit repleading of the state law claims in an appropriate forum. *Procter & Gamble Co. v. Big Apple Indus. Buildings, Inc.*, 655 F.Supp. 1179 (S.D.N.Y.1987). From the dismissal of their complaint, plaintiffs appeal. We now reverse and reinstate the RICO complaint.

## DISCUSSION

■ As part of the Organized Crime Control Act of 1970, Congress enacted the Racketeer Influenced and Corrupt Organizations Act, Pub.L. No. 91–452, 84 Stat. 941 (1970) (codified as amended at 18 U.S. C. §§ 1961–1968) (RICO or the Act), to combat the infiltration into and corruption of America's legitimate business community by organized crime. *Id.* § 1, 84 Stat. at 943 (statement of findings and purpose). The Act's substantive provisions are contained in § 1962, which outlaws the use of income "derived ... from a pattern of racketeering activity" to acquire an interest in, establish, or operate an enterprise engaged in or affecting interstate commerce (subdivision (a)); the acquisition or maintenance of any interest in or control of such an enterprise "through a pattern of racketeering activity" (subdivision (b)); the conduct or participation "in the conduct of such enterprise's affairs through a pattern of racketeering activity" (subdivision (c)); and conspiring to do any of the above (subdivision (d)). 18 U.S.C. § 1962. Those activities that Congress sought to prohibit are contained in 18 U.S.C. § 1962 set forth in the margin.[1] Reading subdivisions (a), (b) and (c) of that section makes it clear that a valid RICO charge must allege the existence of both an enterprise and a pattern of racketeering activity.

In their complaint, plaintiffs refer to § 1962(b), (c), and (d). We agree with the district court that the facts alleged relate only to § 1962(c), and possibly to conspiracy under subdivision (d) to violate subdivision (c). *See United States v. Turkette*, 452 U.S. 576, 584, 101 S.Ct. 2524, 2529, 69 L.Ed.2d 246 (1981) (§ 1962(b) addresses organized crime's infiltration of legitimate business enterprises); *United States v. Parness*, 503 F.2d 430, 438–39 (2d Cir.1974) (acquiring casino hotel by twice transporting stolen cashier's checks violates § 1962(b)), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975).

On this appeal, we are asked whether the facts alleged are sufficient as a matter of law to support plaintiffs' claim that the defendants' conduct formed such a pattern of racketeering activity in violation of § 1962. Taking all of the allegations of plaintiffs' complaint as true, we conclude that a RICO claim was sufficiently pleaded and that a reasonable trier of fact could have found a pattern of racketeering activity. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) ("[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."). Our reasons follow.

## I Elements of a RICO Claim:

### "Enterprise" and "Pattern of Racketeering Activity"

■ To state a § 1962(c) claim plaintiffs must allege the conduct of an enter-

---

1. 18 U.S.C. § 1962 provides in relevant part

 (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce....

 (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to ac-

 quire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

 (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

 (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

prise through a pattern of racketeering activity. *Sedima,* 473 U.S. at 496, 105 S.Ct. at 3285; *see Moss v. Morgan Stanley Inc.,* 719 F.2d 5, 17 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). A pattern of racketeering activity is a series of *criminal acts* as defined in § 1961(1), and the enterprise is generally a *group of persons* associated together for a common purpose of engaging in a course of conduct. *Sedima,* 473 U.S. at 496, 105 S.Ct. at 3285; 18 U.S.C. § 1961(4) (defining "enterprise" as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity"). Evidence of an ongoing organization, the associates of which function as a continuing unit, suffices to prove an enterprise. *Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528.

■ Congress' definition of the RICO pattern of racketeering activity differs from its other RICO definitions; that is, the statute declares that most of the other terms "mean" something, *see, e.g.,* § 1961(1) & (2), while it also provides that " 'pattern of racketeering activity' *requires at least* two acts of racketeering activity, ... the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5) (emphasis added). This "at least" language in the definition suggests that though two predicate acts must be present at a minimum to constitute a pattern, two acts alone will not always suffice to form a pattern. *See Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14 ("The implication is that while two acts are necessary, they may not be sufficient."); *Indelicato,* 865 F.2d at 1382 ("The legislative history is ... inconsistent with a rule that any two acts of racketeering activity, without more, suffice to establish a RICO pattern.").

In *Sedima,* the Supreme Court discussed the legislative history of the pattern requirement:

As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." S.Rep. No. 91–617, p. 158 (1969) (emphasis added). Similarly, the sponsor of the Senate bill, after quoting this portion of the Report, pointed out to his colleagues that "[t]he term 'pattern' itself requires the showing of a relationship.... So, therefore, proof of two acts of racketeering activity, without more, does not establish a pattern...." 116 Cong.Rec. 18940 (1970) (statement of Sen. McClellan). See also *id.,* at 35193 (statement of Rep. Poff) (RICO "not aimed at the isolated offender"); House Hearings, at 665.

473 U.S. at 496 n. 14, 105 S.Ct. at 3285. The Court later noted the need for lower federal courts "to develop a meaningful concept of 'pattern.' " *Id.* at 500, 105 S.Ct. at 3287.

■ In sum, when facing a RICO count in an indictment or complaint, a district court must determine whether it independently alleges both an enterprise—a group of persons in an ongoing association—and a pattern of racketeering activity—a series of allegedly criminal acts. Further, for a pattern to exist, the alleged criminal acts should be characterized by their relatedness and continuity. An enterprise may be sufficiently alleged, but if a pleading does not indicate the existence of both components of the pattern of racketeering activity, a RICO claim should be dismissed. *See Indelicato,* 865 F.2d at 1383 (noting that these concepts are not rigid, and that "[t]he nature of the enterprise may also serve to show the threat of continuing activity"). We turn to an examination of the concepts of continuity and relatedness.

## II Continuity and Relatedness

### A. *Continuity*

In the wake of *Sedima,* other courts have interpreted "continuity" in footnote 14 to require plaintiffs to allege multiple schemes in order to establish a pattern of racketeering activity. *See H.J. Inc. v.*

*Northwestern Bell Tel. Co.*, 829 F.2d 648, 650 (8th Cir.1987) ("A single fraudulent effort or scheme is insufficient."), *cert. granted,* ― U.S. ――, 108 S.Ct. 1219, 99 L.Ed.2d 420 (1988); *International Data Bank, Ltd. v. Zepkin,* 812 F.2d 149, 154 (4th Cir.1987) (requiring multiple criminal episodes to demonstrate continuity); *Superior Oil Co. v. Fulmer,* 785 F.2d 252, 257 (8th Cir.1986) (holding that defendants' actions in converting liquid petroleum gas failed to show sufficient continuity because they "comprised one continuing scheme to convert gas from Superior Oil's pipeline"); *Northern Trust Bank/O'Hare N.A. v. Inryco, Inc.,* 615 F.Supp. 828, 832 (N.D.Ill. 1985) ("It is difficult to see how the threat of continuing activity ... could be established by a single criminal episode."). *But see California Architectural Bldg. Prods. Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1469 & n. 1 (9th Cir.1987) (rejecting "multiple episode" requirement), *cert. denied,* ― U.S. ――, 108 S.Ct. 699, 98 L.Ed.2d 650 (1988); *Bank of America Nat'l Trust & Sav. Ass'n v. Touche Ross & Co.,* 782 F.2d 966, 971 (11th Cir.1986) (rejecting defendants' argument that predicate acts must occur in different criminal episodes and holding that nine acts of wire and mail fraud involving the same parties over a three-year period in the course of single scheme satisfy the pattern requirement); *R.A.G.S. Couture, Inc. v. Hyatt,* 774 F.2d 1350, 1355 (5th Cir.1985) (complaint alleging that defendants twice mailed fraudulent invoices satisfied pattern requirement because the alleged acts were related).

■ We have explicitly eschewed any multiple scheme or episode requirement to demonstrate the continuity of the pattern of racketeering activity. *Indelicato,* 865 F.2d at 1383. Noting that the statutory definition of racketeering activity was cast in terms of "acts" or "offenses," without mention of schemes, episodes, or transactions, we concluded that Congress did not mean "to exclude from the reach of RICO multiple acts of racketeering simply because they achieve their objective quickly or because they further but a single scheme." *Id.* Thus, continuity may be demonstrated in various ways, such as from the nature of the enterprise, as in *Indelicato,* or from the sheer number of predicate acts over several years, or from the number of schemes. As we said in *Beauford,* "[w]hat is required is that the complaint plead a basis from which it could be inferred that the acts ... were neither isolated nor sporadic." 865 F.2d at 1391.

## B. *Relatedness*

■ We next consider the concept of relatedness. In *Sedima,* the Supreme Court suggested that Congress' definition of "pattern" in a later provision of the Organized Crime Control Act of 1970, 18 U.S.C. § 3575(e) (1982), *repealed by* Sentencing Reform Act of 1984, Pub.L. No. 98–473, tit. II, §§ 212(a)(2) and 235(a)(1), 98 Stat.1987, 2031, might illuminate the meaning of the pattern of racketeering activity requirement of § 1962. *See Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14 (citing *Iannelli v. United States,* 420 U.S. 770, 789, 95 S.Ct. 1284, 1295, 43 L.Ed.2d 616 (1975)). Section 3575(e) appears to be especially helpful in construing the requirement of a "relationship" among racketeering acts: "[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 18 U.S.C. § 3575(e) (quoted in *Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14). In *Indelicato* we set forth a non-exclusive elaboration of § 3575(e). A pattern may be found, for example, from an examination of the interrelationship between acts including similarity of goals, methods of their accomplishment, repetitiousness, and closeness of temporal proximity. *See* 865 F.2d at 1382.

We have, moreover, used these factors to evaluate an appellant's claim that there was insufficient evidence to support a jury's finding that a RICO pattern existed.

*See United States v. Teitler,* 802 F.2d 606 (2d Cir.1986). There, appellants were attorneys accused of defrauding insurance companies by creating false documents and encouraging clients to commit perjury in order to inflate the value of automobile accident claims. *Id.* at 608–09. Finding "ample evidence" of a pattern of wrongdoing, we affirmed a RICO conviction on two charges of mail fraud, finding that "the evidence showed that both of the acts of racketeering charged against the appellant had a similar purpose, namely, defrauding insurance companies; both shared similar success in defrauding such companies; both shared similar participants and similar victims; and both employed similar methods." *Id.* at 612. The question that must always be answered, therefore, is whether a complaint adequately alleges facts from which it may be inferred that the predicate acts are interrelated, using the above factors as indications of relatedness.

### C. *Summary of Continuity and Relatedness*

■ For the purposes of RICO, "continuity" means that separate events occur over time and perhaps threaten to recur, while "relatedness" means—given that different acts of racketeering activity have occurred—that there is a way in which the acts may be viewed as having a common purpose. These concepts are separately compartmentalized for analytic purposes, largely to ensure that the wrongful activity alleged is neither sporadic nor isolated, and that the acts have similar or common purpose and direction. The Supreme Court instructs that "[w]hile the proof used to establish these separate elements [of enterprise and pattern] may in particular cases coalesce, proof of one does not necessarily establish the other." *Turkette,* 452 U.S. at 583, 101 S.Ct. at 2529. Ordinarily, proof of these concepts of continuity and relatedness in the pattern will vary in each case.

Our decisions in *Indelicato* and *Beauford* are illustrative. In the former, proof of the purpose and nature of the RICO *enterprise,* combined with the character of the offenses charged, satisfied the requirement of continuity because it tended to prove a threat of ongoing RICO activity. *Indelicato,* 865 F.2d at 1383, 1384–85. The predicate acts—three assassinations of rival Cosa Nostra family leaders—occurred with virtual simultaneity. Yet, despite the seemingly finite duration of the predicate acts, the threat of continuity clearly existed in view of the RICO enterprise and its obvious drive for greater wealth and power. *Id.* at 1384–85; *see also United States v. Watchmaker,* 761 F.2d 1459 (11th Cir. 1985) (virtually simultaneous shootings of three police officers satisfied RICO pattern requirement for member of the Outlaw Motorcycle Club), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 917 (1986).

In *Beauford,* "the nature of the enterprise [did] not of itself suggest that the racketeering acts [would] continue." 865 F.2d at 1391. The continuity or threat of continuity necessary to adequately allege a RICO pattern was found by focusing on factors other than enterprise. *Id.* Plaintiffs alleged that when seeking to convert a large apartment complex into condominium units, defendants mailed to thousands of tenants and prospective buyers an offering plan that contained material misrepresentations and omissions amounting to fraud. Their allegations of more than 8,000 acts of mail fraud—all directed toward the common goal of inflating profits from the conversion—satisfied the relatedness requirement. *Id.* at 1392. We found the necessary continuity or threat of continuity in the assertions in plaintiffs' complaint that a large percentage of apartments were as yet unsold, the offering plans had been amended, and further amendments were likely. The pleadings thus sufficiently alleged the basic requirements of a RICO cause of action. *Id.*

### III Analysis of Instant Complaint

We therefore turn to an analysis of the plaintiffs' complaint in light of the above discussed concepts. The district court

characterized the RICO complaint as alleging "a scheme by a contractor to bilk its customer as to a construction project." 655 F.Supp. 1179, 1182 (S.D.N.Y.1987). It found that the necessary element of continuity was lacking principally because the "single, finite project" was not of a continuing nature, without "continuing criminal objectives"—notwithstanding the allegations in the complaint of five separate fraudulent episodes. Thus, the district court judge focused on the element of *enterprise*, relying understandably on the now-rejected view expressed in *United States v. Ianniello*, 808 F.2d 184, 191 (2d Cir.1986), *cert. denied*, 483 U.S. 1006, 107 S.Ct. 3229, 97 L.Ed.2d 736 (1987). *See Indelicato*, 865 F.2d at 1382 (discussing *Ianniello*). Concluding that defendants were "engaged in a single lawful project of finite scope and duration," the district judge dismissed the RICO cause of action despite "[a]llegations of numerous instances of fraud." 655 F.Supp. at 1184.

Subsequent to Judge Leval's ruling, of course, we have held explicitly that "relatedness and continuity are essentially characteristics of [the pattern of racketeering] activity rather than of enterprise." *Indelicato*, 865 F.2d at 1382; *see also Beauford*, 865 F.2d at 1391. Moreover, we have rejected any need to allege multiple schemes. *See Beauford*, 865 F.2d at 1391. In this Circuit, a RICO claim may be adequately pleaded without an allegation of "an ongoing scheme having no demonstrable ending point." *Id.* Again, the complaint must provide allegations sufficient to infer that an enterprise exists, and that the acts of racketeering were neither isolated nor sporadic.

■ Against this standard it is clear that plaintiffs alleged an adequate and colorable cause of action under RICO. Their complaint plainly asserts the existence of a RICO enterprise or "group of persons associated together for a common purpose of engaging in a course of conduct" which functioned then as a "continuing unit." *See Turkette*, 452 U.S. at 583, 101 S.Ct. at

3528. A pattern of racketeering activity may be discerned from the facts alleged in plaintiffs' 77–page complaint. It claims that defendants engaged in at least five separate fraudulent schemes: (1) inducing execution of the ten-year studio lease by fraudulently misstating their experience, expertise, and construction cost estimates; (2) inducing plaintiffs to continue with the project, and inducing P & G to guarantee construction financing by fraudulently misrepresenting and concealing costs; (3) fraudulently diverting construction funds and charging excessive professional and other fees; (4) improperly escrowing construction loan funds to build a "cushion" against discovery of the alleged fraud; and (5) fraudulently scheming to collect "interim rent" for delays primarily caused by defendants.

These violations of the Federal Mail Fraud Act, 18 U.S.C. §§ 1341–1343 (1982), resulting from written and oral misrepresentations as to defendants' expertise, as to construction costs, and from sending false and excessive invoices and certifications over a period of nearly two years, are not isolated or sporadic actions. *See Beauford*, 865 F.2d at 1391–92. While multiple schemes are not essential for demonstrating continuity or a threat of continuity, here it is alleged that defendants conducted fraudulent business activities on a number of fronts in five separate schemes. Our dissenting colleague's characterization of this conduct as "isolated", and his attempt to draw a line that limits civil RICO to those cases where the threat of continuing activity "truly exists" apparently ignores the fact that the instant litigation is only at the pleading stage. Whether defendants' actions are continuing in nature or isolated or sporadic will be the subject of proof at trial. The accepted-as-true allegations in the complaint refute the view that defendants' fraudulent actions towards plaintiffs were unrelated or disconnected. Hence, the spectre of continuity of criminal offenses in the pattern of activity is sufficiently pleaded to withstand dismissal at this stage of the litigation. *See Sedima*,

473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14. *Beauford,* 865 F.2d at 1391–92.

 Finally, the complaint sufficiently alleges the relatedness between predicate acts to demonstrate a pattern. The alleged acts had the same purpose, that is, fleecing the same victims—P & G and Riverview—and employing similar unlawful methods of commission—namely, the misrepresentation of Big Apple's experience, of construction costs and the padding of billings to plaintiffs. *See Indelicato,* 865 F.2d at 1383. Consequently, the pleading satisfied the basic elements of a RICO cause of action by alleging the conduct of that enterprise through a pattern of racketeering activity, and that the pattern was characterized by the relatedness and continuity of the underlying criminal acts.

## CONCLUSION

The judgment of the district court is accordingly reversed, the complaint reinstated, and the matter is remanded to the district court for further proceedings on the merits.

WINTER, Circuit Judge, dissenting:

Acknowledging the difficulty of the question at issue, I respectfully dissent.

Our recent decisions in *United States v. Indelicato,* 865 F.2d 1370 (2d Cir.1989) (en banc) and *Beauford v. Helmsley,* 865 F.2d 1386 (2d Cir.1989) (en banc), teach that the existence of the relatedness and continuity requisite to a finding of a pattern of racketeering activity is to be determined by viewing the facts or allegations as a whole and without the application of mechanical tests such as requirements of multiple or open-ended schemes or separation of temporal acts. *Id.* at 1391. My disagreement with my colleagues stems from their holding that any allegation of multiple related acts separated in time is, without more, enough to establish continuity.

The fact that multiple acts separated in time may not by themselves be sufficient was one reason that *Indelicato* and *Beauford* distinguished between enterprises that are inherently criminal and those that are not. In the case of the former, multiple acts in furtherance of the enterprise necessarily carry with them the threat of continuing illegal activity even if simultaneous. In the case of the latter, multiple acts even if separated in time do not necessarily carry with them that threat. *Id.* We thus held in *Beauford* that a complaint stated a valid civil RICO claim where there had been thousands of fraudulent mailings to an indeterminate number of largely unrelated victims—all persons who might be interested in purchasing one of several thousand apartments—*and* there was an expectation based on the anticipated rate of sales and the need to update offering papers that "similarly fraudulent mailings would be made over an additional period of years." 865 F.2d at 1392.

The present case is very different, however. First, in *Beauford* there were vastly greater numbers of fraudulent acts and there was an explicit intention to continue the mailings. Second, the sole victims of the fraud in the present case are two corporations working essentially as principals in a joint venture to complete a single construction project. In contrast, the victims in *Beauford* were a segment of the general public. It simply belies belief that the racketeering acts alleged here—misrepresentations to Procter & Gamble and Riverview as to expertise, cost estimates, actual costs and various diversions of funds with regard to one project—were not inherently self-limiting. The defendants surely had testable expectations as to progress in the construction that would be directly affected by the fraudulent acts. The length and breadth of the plaintiffs' allegations being those acts, these defendants and that

project, I have no hesitation in labeling the conduct here "isolated."

To be sure, it was the case in *Beauford* that the fraud would ultimately cease, but only because of the wisdom in Lincoln's dictum that you can fool some of the people some of the time but not all of the people all of the time. Where the enterprise is not inherently criminal, fraudulent acts directed to large numbers of unrelated people entail a far different risk of a continuation of illegal acts than do acts directed at a small number of related commercial entities capable of quickly learning the true facts. This distinction is of considerable importance in the RICO context. If adopted, it would limit civil RICO to those cases most likely to involve sustained harm to the public and would avoid transforming every private dispute over a periodic performance contract into a RICO claim. It may be that the line I am seeking to draw is neither bright nor straight, but it is a line that is discernible and of usefulness in limiting civil RICO to situations in which the threat of continuing activity truly exists. Moreover, I fear that my colleagues have adopted a test that may turn out to be no line at all. If, for example, a lumber yard selling to the Riverview project were to deliver five loads of lumber in each of which one two-by-four was missing and then mail five bills for the full amount, a civil RICO claim could be alleged under their theory.

I therefore respectfully dissent.