UNITED STATES of America, Appellee,

v.

Jay TEITLER and Marc G. Schultz, Defendants-Appellants.

Nos. 801, 802, Dockets 85–1364, 85–1382 and 85–1404.

United States Court of Appeals, Second Circuit.

Argued Feb. 13, 1986.

Decided Sept. 25, 1986.

PIERCE, Circuit Judge:

These appeals are from judgments of conviction entered after a jury trial in the United States District Court for the Eastern District of New York, Weinstein, *Chief Judge.* Appellant Jay Teitler was convicted of conspiring to conduct the affairs of an enterprise through a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act, (RICO), 18 U.S.C. § 1962(d) (1982), and of one count of mail fraud in violation of 18 U.S.C. § 1341 (1982). Appellant Marc Schultz was convicted of conspiring to violate RICO as well as a substantive RICO violation, 18 U.S.C. § 1962(c) (1982), and two mail fraud counts.[1] Novel questions are raised concerning the interpretation of the meaning of "pattern" as described in the RICO statute as well as the applicability of common law conspiracy rules to RICO conspiracies. For the reasons set forth below, we affirm the judgments of conviction.

Robert M. Stolz, Asst. U.S. Atty., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty. for E.D.N.Y., Jane Simkin Smith, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for appellee.

Mark F. Pomerantz, New York City (Ronald P. Fischetti, Warren L. Feldman, Fischetti, Feigus & Pomerantz, New York City, of counsel), for defendant-appellant Jay Teitler.

Otto G. Obermaier, New York City (Robert J. Anello, Faye Kessin, Steven S. Knitzer, Obermaier, Morvillo & Abramowitz, P.C., New York City, of counsel), for defendant-appellant Marc Schultz.

Before LUMBARD, PIERCE and ALTIMARI, Circuit Judges.

## BACKGROUND

Over a number of years, according to the indictment, a law firm in Queens County, New York, defrauded insurance companies by manipulating claims arising out of automobile accidents. Appellants Teitler and Schultz were attorneys at the firm. According to the indictment, the firm itself was the "enterprise" with which the appellants associated and carried out a pattern of racketeering activity. *See* 18 U.S.C. §§ 1962(c), (d) (1982). Appellants, along with others, were charged in an indictment alleging twenty-nine "acts of racketeering" —including twenty-eight mail fraud violations, *id.* § 1341, and one count of obstruction of justice, *id.* § 1503. The defendants were Norman Teitler, Morris Teitler, Leo Guise, Ted Dakis, Ismail D'Javid, Jean P. Hartman, Jay Teitler, Marc Schultz and

1. Teitler was sentenced to five years imprisonment on each count to run concurrently; execution was suspended except for six months imprisonment and the remainder on probation with the condition that Teitler "have no connection with the law." Also, a fine totaling $10,100 was imposed. Schultz was sentenced to five years imprisonment; execution of sentence was suspended on each count and he was placed on probation for five years with several conditions imposed, one of which was that he "have nothing to do with the practice of law." Schultz also was fined a total of $22,200.

Maureen Murphy. Schultz, Murphy and Jay Teitler were tried together. The charges against the other defendants were disposed of separately. The head of the firm, Norman Teitler, pleaded guilty. Jay Teitler was named in two mail fraud counts and Schultz was named in three. Both appellants were named in the RICO and RICO conspiracy counts. Maureen Murphy was named in the obstruction of justice count, one mail fraud count, and in the RICO and RICO conspiracy counts. The counts against Murphy were tried along with the charges against Schultz and Teitler. Neither Schultz nor Teitler was charged with obstruction of justice.

The indictment charged that the method of operation employed by the enterprise included the creation of false documents and the encouragement of perjury by the firm's clients in order to inflate their injuries and expenses so as to obtain better settlements from insurance companies and recover higher damage awards in negligence lawsuits brought by the firm. The government contends that the fraud took several forms—creation of false medical bills, submission of false affidavits to document housekeeping services that were never rendered and lost wages that were never earned; referral of clients to doctors who provided backdated bills and exaggerated medical reports; and procurement of false testimony at trials and examinations before trial (EBTs). Further, when a grand jury investigation was underway, defendants Norman Teitler, head of the firm, and Maureen Murphy, a firm employee, allegedly tried to induce false testimony before the grand jury.

The indictment charged that the firm took advantage of a provision of New York's no-fault law that reimburses a person injured in an automobile accident for medical expenses, lost earnings and up to $25 per day expenses without regard to fault or liability for the accident. N.Y.Ins. Law §§ 5102(a), 5103 (McKinney 1985). The no-fault benefits are limited to $50,000 per person and are paid by the injured driver's insurance company. *Id.* In addition, a person who has been seriously in-

jured may institute a "third party suit" against the other driver to recover compensation for non-economic losses such as pain and suffering and economic losses above the amount paid by no-fault coverage. *Id.* §§ 5102(d), 5104. According to the record evidence, ninety-five percent of such third party suits are settled by the other driver's insurance carrier based on its assessment of the damages sustained. The amount of the settlement is arrived at after consideration of the information provided to the no-fault insurers, including a description of the plaintiff's injuries as described in EBT's, and proof of special damages, i.e. medical bills, lost wages and housekeeping expenses; this information provides an index of the seriousness of the injury and consequently a guideline to gauge the amount of the settlement.

The evidence at trial revealed the manipulation of the no-fault system and third party suits by the law firm. The evidence against appellant Jay Teitler showed that he began working at the firm in 1976, first as a paralegal, then as an associate and finally as a partner of his brother, Norman Teitler. The testimony of government witness Edward Dunbar, a former paralegal at the firm, indicated that Jay Teitler knew of the firm's practices. Dunbar testified that Jay told him that, when signing up clients, Dunbar should encourage them to see doctors often to enhance their chances of large recoveries. Jay Teitler told him, "how we fill up third-party actions [is to] send him to [Dr.] Hartman, and Hartman will send us a report and a bill." In addition, Dunbar testified that Jay Teitler told him that the firm kept a large portion of the housekeeping expenses, which were based on false affidavits, because "the clients won't scream because they're not entitled to it in the first place, and he [Norman Teitler] makes a lot of money on it."

Jay Teitler was charged in two mail fraud counts, which became the predicates for the seventh and eighth acts of racketeering respectively in the indictment. Jay Teitler, Norman Teitler, and Dr. Hartman

were charged with mail fraud in connection with the false housekeeping and medical claims made on behalf of one Barbara Brucato. Jay Teitler was the attorney of record for Brucato's personal injury claim filed with the insurance company after her automobile accident on September 26, 1979. The trial evidence showed that Jay Teitler sent Brucato to Dr. Hartman, who recorded nineteen visits by Brucato over the ensuing months in his report; the report also described a knee injury as a "permanent partial disability." Brucato testified that she visited Hartman only five or six times and that her knee was not injured. She further testified that she wanted to stop seeing Hartman, but Jay told her that she should continue because "it didn't look good" if she stopped. Jay gave Brucato an affidavit for her mother to sign as her housekeeper. She returned the form as instructed by Jay—signed, but with the information left blank. The form was completed by Norman Teitler; he described the relationship between Brucato and Brucato's mother as "none," and stated that the latter had been paid $25 per week. The no-fault insurer paid $1,375 in housekeeping benefits, of which Brucato received only $725. After receiving these documents, the third party carrier settled the personal injury claim for $3,500. The jury convicted Jay Teitler of the mail fraud count involving these acts, but was unable to reach a verdict on the second mail fraud count charged, which involved Jay's purported role in filing a false claim on behalf of his father, Morris Teitler. Jay Teitler was also convicted of participating in a RICO conspiracy in violation of 18 U.S.C. § 1962(d), but the jury was unable to reach a verdict on the substantive RICO count.

Appellant Marc Schultz was a trial lawyer who worked at the firm as an associate from July 1978 until February 1983. The indictment alleged that Schultz encouraged and counseled perjury by the firm's clients concerning medical treatment provided by Dr. Ismail D'Javid and concerning housekeeping services provided by Marilyn Vargas, an employee at the firm. The indictment contained three mail fraud counts

against Schultz involving three of the firm's clients. These mail frauds were alleged to be the predicates for the racketeering charges in the indictment.

James McCurdy testified that he retained the Teitler firm in connection with injuries he sustained in an automobile accident on July 10, 1978. Jay Teitler sent him to Dr. D'Javid, whom McCurdy testified he saw three times although, according to D'Javid's bill and report, McCurdy made eighteen visits. A lawsuit was commenced for McCurdy's personal injury claim. McCurdy testified that immediately before an EBT in December 1979 he told Schultz that the bill was "untrue and incorrect." He testified that Schultz told him that he "had to answer according to that bill that [he] went to see the doctor on that many days and that the doctor gave [McCurdy] treatments." The case was settled by the third party insurance company for approximately $11,000.

Another client who retained the firm, however, refused to follow Schultz's instructions. Reverend William Hanousek testified that the Teitler firm sent him to see Dr. D'Javid after his automobile accident in March 1977. Hanousek testified that he saw D'Javid only a few times but that the bill and report listed sixteen visits. The no-fault carrier paid $540 to satisfy D'Javid's false bill. A lawsuit was commenced to recover for Hanousek's personal injuries. Hanousek testified that he told Schultz that he would not testify about the false bill. Schultz replied "[y]ou really worry me, Reverend." Schultz then allegedly left the room and, after having conferred with Norman Teitler, returned to inform Hanousek that the claim had been or would be settled. The case was in fact settled on April 10, 1980 for $2250.

Lastly, Kenneth Gambella testified that Schultz represented him at an EBT concerning his personal injury claim. Gambella admitted that he lied about his housekeeping expenses by saying Marilyn Vargas was his housekeeper, when actually she was an employee of the law firm. Norman Teitler provided affidavits concerning

her purported housekeeping services. Thereafter, Gambella's third-party suit was settled for $4600.

Marc Schultz was convicted of a substantive RICO violation, 18 U.S.C. § 1962(c), RICO conspiracy, *id.* § 1962(d), and the two counts of mail fraud relating to the McCurdy and Hanousek incidents. The jury was unable to reach a verdict on the mail fraud count relating to the Gambella claims.

Appellants challenge their convictions on several grounds. Teitler contends, *inter alia,* that the evidence was insufficient to sustain his conviction for RICO conspiracy; that the charge to the jury was legally insufficient as to the RICO conspiracy and the two acts of racketeering underlying the RICO conspiracy conviction were insufficient to constitute a "pattern of racketeering" as required by the RICO statute; and that the evidence was insufficient to sustain a conviction for mail fraud in connection with the Brucato claims. Appellant Schultz contends, *inter alia,* that the obstruction of justice charges against Maureen Murphy were improperly joined with the charges against him and that this was a violation of Fed.R.Crim.P. 8(b); that the government impermissibly amended the indictment; and that the trial judge improperly admitted co-conspirator hearsay evidence by permitting Dunbar's testimony about Jay Teitler's out-of-court statements.

## DISCUSSION

### I. *Jay Teitler*

#### A. The Rico Conspiracy Count

Appellant Teitler argues that, with respect to his alleged participation in a RICO conspiracy in violation of 18 U.S.C. § 1962(d), the trial judge erred in instructing the jury that it need only find an *agreement* on his part to commit two predicate acts, rather than actual *commission* of the acts. He also contends that the jury could not, on the evidence before it, find an agreement to commit the predicate acts without first finding that he actually committed the acts. Finally, Teitler posits that

the acts of racketeering underlying the RICO conspiracy conviction were insufficient as a matter of law to constitute a pattern of racketeering. We are not persuaded by these arguments.

### 1. *The Sufficiency of the Charged Predicate Acts*

■ Jay Teitler asserts that the two acts with which he was charged will not suffice to establish the requisite pattern of racketeering required by 18 U.S.C. § 1961(5).

Appellant argues that the trial judge improperly charged the jury because he did not instruct the jurors that they had to find *at least* two and possibly more acts of racketeering activity. He contends that this is required by footnote 14 of *Sedima, S.P.R.L. v. Imrex Co.,* —— U.S. ——, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), and points out that Justice White stated that the language of 18 U.S.C. § 1961 requires at least two acts, "not that it 'means' two such acts." *Id.* at 3285 n. 14. In other words, it is argued that two such acts are required, but will not alone constitute a pattern. Appellant therefore believes that the trial judge erred by refusing to instruct the jury that it had to find *at least* two and possibly more acts of racketeering activity.

We do not accept appellant's interpretation of footnote 14. Justice White stressed that the number of acts is not crucial: "[W]hile two acts are necessary, they may not be sufficient." *Id.* Instead, the key question is whether the factor of " 'continuity plus relationship' " shows that the subject acts were not " 'sporadic activity,' " but part of a pattern. *Id.* (quoting S.Rep. No. 617, 91st Cong., 1st Sess. 158 (1969)) (emphasis in original). The most stringent reading of footnote 14 would require that the prosecution show " 'the same or similar purposes, results, participants, victims, or methods of commission....' " *Sedima,* 105 S.Ct. at 3285 n. 14. (quoting 18 U.S.C. § 3575(e)); *see generally Alexander Grant & Co. v. Tiffany Industries, Inc.,* 770 F.2d 717, 718 n. 1 (8th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 799, 88 L.Ed.2d 776 (1986); *Rojas v. First Bank National Asso-*

**612**

*ciation,* 613 F.Supp. 968, 971 n. 1 (E.D.N.Y.1985); *Systems Research, Inc. v. Random, Inc.,* 614 F.Supp. 494, 497 (N.D.Ill. 1985). Even if we were to accept this interpretation, Chief Judge Weinstein's charge clearly addressed these concerns:

A pattern of racketeering activity is committed if the Defendant committed at least two of the racketeering acts charged against him or her in the indictment....

. . . . .

In addition [to proving two racketeering acts], the government must prove beyond a reasonable doubt that the predicate acts constituted part of a larger pattern of activity that characterized each Defendant's conduct of or participation in the affairs of the law firm. That is to say, the predicate acts must have been connected with each other by some common scheme, plan or motive so as to constitute a pattern and not merely a series of disconnected acts.

Tr. of Aug. 8, 1985, at 45.

The second element is that the accused willfully became a member of the conspiracy....

This means that in order to meet its burden of proof, the Government must show that the Defendant, knowing the object of the conspiracy, agreed to join with others to achieve those objects, namely the conducting of the affairs of the enterprise through each of them agreeing to commit at least two of the predicate acts identified as the objects of the conspiracy.

*Id.* at 54.

A RICO conspiracy conviction requires something more than an ordinary conspiracy. The Defendant must have agreed to assist in at least two of the predicate acts he or she is accused of committing.

This means that the Government must prove beyond a reasonable doubt agreement to commit two charged predicate crimes.

*Id.* at 59–60. This charge certainly reflects Justice White's observations in footnote 14.

The appellant further argues that the record lacked evidence that would permit the jury reasonably to find the required pattern. However, the evidence showed that both of the acts of racketeering charged against the appellant had a similar purpose, namely, defrauding insurance companies; both shared similar success in defrauding such companies; both shared similar participants and similar victims; and both employed similar methods. Further, evidence was presented regarding Jay Teitler's directive role in the operations of the law firm. We conclude that the jury had ample evidence from which it could find that the predicate acts Jay Teitler agreed to perform were part of a RICO pattern.

2. *The Trial Court's Charge on the RICO Conspiracy Count*

As discussed, the indictment charged Jay Teitler with two counts of mail fraud, which also served as the predicate acts for the RICO conspiracy charges against Teitler. The district judge charged the jury that a defendant could be convicted of participating in a RICO conspiracy if he *agreed* to commit two predicate acts, even if he did not actually carry them out:

[T]he Government must prove beyond a reasonable doubt agreement to commit two charged predicate crimes....

You do not have to find that any racketeering acts were actually committed by a Defendant to find him or her guilty of a conspiracy.

During its deliberations, the jury inquired as to whether a defendant could be convicted of RICO conspiracy if convicted of only one mail fraud count. The trial judge answered affirmatively and briefly instructed the jury again. Thereafter, the jury returned a verdict convicting Teitler of one mail fraud count and of the RICO conspiracy count. The jury was unable to reach a verdict on the second mail fraud charge.

Teitler argues that this case is governed by *United States v. Ruggiero,* 726 F.2d 913

(2d Cir.), *cert. denied*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984), which requires proof that a defendant at least agreed to commit two predicate acts in order to prove a RICO violation. *Id.* at 921. In *Ruggiero*, defendant Tomasulo was charged with two predicate acts, one of which was a gambling conspiracy—an act legally insufficient to serve as a RICO predicate act. *Id.* at 919–20, 921. The government argued that no predicate acts were necessary for a RICO conspiracy charge. Instead, it asserted, it was sufficient for the defendant to have conspired with others to engage in an enterprise through a pattern of racketeering acts committed by others. *Id.* at 921. This Court rejected the government's argument and stated that "to convict on a RICO conspiracy [the government] must prove that defendant himself at least agreed to commit two or more predicate crimes." *Id.; see United States v. Bagaric*, 706 F.2d 42, 62 & n. 17 (2d Cir.), *cert. denied*, 464 U.S. 917, 104 S.Ct. 283, 78 L.Ed.2d 261 *and* 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983); *United States v. Barton*, 647 F.2d 224, 237 (2d Cir.), *cert. denied*, 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981).

This case is distinguishable from *Ruggiero*. In that case, the defendant could not be found to be a RICO conspirator since he was charged with conspiring to commit only *one* RICO predicate act—the other act alleged was not a RICO predicate act. Here, Teitler was charged with agreeing to commit *two* RICO predicate acts. Although he was convicted of *committing* only one act, the jury was properly instructed that it could find that Teitler *agreed* to commit the other predicate act as well. Thus, the holding in *Ruggiero* is not governing here.

Teitler further argues that the *Ruggiero* court was compelled to reverse a RICO conspiracy conviction against co-defendant Santora because one of the eight predicate acts with which Santora was charged was

not a RICO predicate act and because the record did not show whether the legally insufficient act was relied upon by the jury in returning a RICO conviction. The court suggested that this problem could have been avoided through the use of special verdicts. *Ruggiero*, 726 F.2d at 921–23. However, here both RICO predicate acts charged against Teitler were legally sufficient and therefore, once properly instructed, the jury could not have convicted Teitler based on a legally insufficient predicate.

We find no authority for the proposition that a person must *commit* two predicate acts of racketeering to be convicted of a RICO conspiracy. *See United States v. Carter*, 721 F.2d 1514, 1528–31 (11th Cir.), *cert. denied*, 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984); *United States v. Boffa*, 688 F.2d 919, 937 (3d Cir.1982), *cert. denied*, 460 U.S. 1028, 103 S.Ct. 1280, 75 L.Ed.2d 501 *and* 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983); *United States v. Brooklier*, 685 F.2d 1208, 1220–21 (9th Cir.1982), *cert. denied*, 459 U.S. 1206, 103 S.Ct. 1195, 75 L.Ed.2d 439 (1983); *United States v. Karas*, 624 F.2d 500, 503 (4th Cir.1980), *cert. denied*, 449 U.S. 1078, 101 S.Ct. 857, 66 L.Ed.2d 800 (1981). In accord with *Ruggiero, supra*, Chief Judge Weinstein properly required the jury to determine whether the defendant *agreed* to *commit* two predicate acts.

It is fundamental that criminal conspiracy is an agreement among two or more persons to commit a crime. The crime of conspiracy does not require actual commission of the substantive crime. We must not confuse the predicate act requirement of 18 U.S.C. § 1962(d) with the overt act requirement of conspiracy statutes such as 18 U.S.C. § 371.[2] Section 1962(d) does not require proof of overt acts. *Barton*, 647 F.2d at 237 (citing *Singer v. United States*, 323 U.S. 338, 340–42, 65 S.Ct. 282, 283–84, 89 L.Ed. 285 (1945)). We therefore conclude that the trial court properly charged

---

**2.** Commonly, under a conspiracy statute, it must be shown that the conspirator committed an overt act in furtherance of the conspiracy. *See United States v. Barton*, 647 F.2d 224, 237

(2d Cir.1981); W. LaFave & A. Scott, Handbook on Criminal Law § 62, at 478–82 (1972); *see, e.g.,* 18 U.S.C. § 371 (1982); Model Penal Code § 5.03.(5) (1962).

the jury with respect to the RICO conspiracy count.

### 3. Sufficiency of the Evidence of Participation in the RICO Conspiracy

■ Jay Teitler argues that the jury could not reasonably have convicted him of RICO conspiracy on the evidence presented. He argues that since the jury had no direct evidence of his agreement to participate in the event, and deadlocked with respect to the actual commission of it, the evidence could not have shown that he conspired to commit the act charged. However, the jury had before it circumstantial evidence tending to show that Jay Teitler played a role in the fraud. This evidence included his statements made to Dunbar indicating knowledge of wrongdoing, his status as a partner in the Teitler firm, and Dunbar's testimony concerning Jay Teitler's role in the firm. The jury could reasonably infer from this evidence Jay's agreement to participate in the fraud.

As we have noted, during their deliberations the jury sent a note to the judge which asked whether a defendant could be convicted of RICO conspiracy if he was convicted of only one mail fraud count. Appellant asserts that this note is capable of being interpreted in at least two ways, either of which would have required a verdict of acquittal: it could mean that the jury believed that Jay Teitler had no role in a fraud in the father's accident case, or it could mean that the jury found that he agreed to commit fraud, but it did not find enough evidence to convict him of carrying out his planned role in it.

In response to the note, Chief Judge Weinstein explained:

A RICO conspiracy conviction requires something more than an ordinary conspiracy. The defendant must have agreed to assist in at least *two* of the predicate acts he or she is accused of committing. This means that the government must prove beyond a reasonable doubt an agreement to commit *two* charged predicate crimes....

That is to say that Jay Teitler agreed as part of his conspiratorial agreement to commit *both* acts of mail fraud charged....

You do not have to find that any racketeering acts were actually committed by a defendant to find him or her guilty of the conspiracy....

(emphasis added).

This explanation made it clear to the jury that Jay Teitler could not be convicted of RICO conspiracy unless it found that he agreed to commit two predicate acts. We hold that the jury was properly charged, and, further, that it had sufficient evidence before it to find Jay Teitler guilty of a RICO conspiracy.

### B. Sufficiency of the Evidence for Teitler's Mail Fraud Conviction

■ Jay Teitler's claim that the evidence is insufficient to support his conviction for mail fraud in connection with the Brucato claim lacks merit. It is settled that we must construe the evidence in the light most favorable to the government and draw all inferences in its favor. *Glasser v. United States*, 315 U.S. 60, 81, 62 S.Ct. 457, 470, 86 L.Ed. 680 (1942); *United States v. Martino*, 759 F.2d 998, 1002 (2d Cir.1985). Teitler contends that no direct evidence showed that he was aware that the bill and report submitted by Dr. Hartman were false or that the reports of housekeeping expenses had been falsified. However, the government's evidence included Dunbar's testimony that Jay Teitler had discussed sending clients to Hartman to obtain inflated reports and bills and that Teitler also had discussed the housekeeping scheme. Based on Teitler's position as a partner at the firm and evidence of his knowledge of these firm practices, as well as the evidence of his knowledge that Brucato did not wish to continue seeing Hartman, a jury could reasonably infer that Jay Teitler knew that the firm's practice of settling third party suits based on false medical reports was being employed in Brucato's case. Further, there was evidence that it was Jay Teitler who requested

that Brucato sign the housekeeping form in blank, an example of the practice which Jay had described to Dunbar; that the form submitted to the insurance company falsely stated the amount of compensation; and that the form falsely described the housekeeper, whom Jay knew to be Brucato's mother, as unrelated to her. In addition, there was evidence that Jay Teitler told Brucato that the firm was entitled to retain half of the housekeeping benefits, a representation with no basis in New York's nofault law. N.Y.Ins. Law §§ 5101–5108 (McKinney 1985). Teitler's explanation to Dunbar of the firm's ability to take such a large percentage was that "clients won't scream because they're not entitled to it in the first place." Based upon this evidence, a jury certainly could reasonably conclude that Teitler participated in employing the housekeeping fraud in Brucato's case, and the parties stipulated that the no-fault carrier mailed payments for the claimed expenses. We therefore reject Teitler's claim that the evidence is insufficient to support his mail fraud conviction.

## II. *Marc Schultz*

Appellant Schultz suggests that the charges against him were joined improperly with the count of obstruction of justice against Maureen Murphy, which also was pleaded as one of the predicate acts of racketeering against Murphy in the RICO counts.

### A. Joinder of Counts Against Schultz with Obstruction of Justice Counts Against Others

Schultz points out that the obstruction charge referred to an alleged attempt by Maureen Murphy and Norman Teitler to tamper with a grand jury investigation of the Teitler law firm. This aspect of the investigation centered on the firm's representation of two clients—Gertrude Jarrette and Camilla Gorin. No trial evidence indicated that Schultz participated in the representation of those clients and the government conceded that Schultz never participated in the obstruction of justice. In fact,

Schultz had left the firm nearly two years before the alleged grand jury tampering occurred. The thrust of Schultz's argument is that the acts of Norman Teitler and Maureen Murphy that allegedly obstructed justice would have been part of a separate conspiracy from the conspiracy charged against Schultz. Schultz claims that this is a "classic" *Grunewald* situation in which there is a separate conspiracy in which the object is to avoid prosecution for another criminal conspiracy. *Grunewald* held that an agreement to conceal a conspiracy is not necessarily part of the predecessor conspiracy. *See Grunewald v. United States*, 353 U.S. 391, 399–406, 77 S.Ct. 963, 971–75, 1 L.Ed.2d 931 (1957); *see also Krulewitch v. United States*, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949). There instead may be a separate conspiracy to conceal the predecessor conspiracy. Members of the original conspiracy may not be convicted for the conspiracy to conceal unless they actually participated in the conspiracy to conceal. *Grunewald, supra.*

Fed.R.Crim.P. 8(b) states:

Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or *in the same series of acts or transactions* constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

(emphasis added). The pivotal question raised by Schultz is whether the obstruction of justice allegedly engaged in by Murphy and Norman Teitler was "in the same series of acts or transactions" as the acts for which Schultz was charged and convicted.

We note initially that participation in a series of transactions does not require participation in each transaction. *United States v. Bagaric*, 706 F.2d 42, 69 (2d Cir.), *cert. denied*, 464 U.S. 917, 104 S.Ct. 283, 78 L.Ed.2d 261 *and* 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983); *United States v. Barton*, 647 F.2d 224, 239–40 (2d Cir.),

*cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981); *United States v. Weisman,* 624 F.2d 1118, 1129 (2d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980). If a series of transactions constitutes a pattern of predicate acts in a RICO conspiracy, they can properly be joined in one indictment. *Weisman,* 624 F.2d at 1129. Whether the proof establishes one or multiple conspiracies is a question of fact for the jury. *United States v. Alessi,* 638 F.2d 466, 472 (2d Cir.1980).

■ In this case, the jury found Maureen Murphy guilty of participating in a RICO enterprise through a pattern of racketeering activity. Because Murphy was convicted of only two counts that served as predicate acts of racketeering, and because one of those counts was grand jury obstruction, one of the predicate acts on which the trial jury based its finding had to be Murphy's participation in the grand jury tampering. Therefore, the jury undoubtedly found that Murphy's obstruction was part of the same enterprise in which Marc Schultz participated. Such a finding cannot be considered unreasonable in light of the extensive evidence of Murphy's participation in the enterprise and the evidence that the grand jury obstruction was related to the activities of the enterprise. Viewing Murphy's grand jury obstruction as part of the activities of the enterprise, it was part of the same series of transactions as the crimes charged against Schultz and can be charged in one indictment. *See Weisman,* 624 F.2d at 1129 (if series of transactions constitute a RICO pattern, they can properly be joined in one indictment).

Schultz counters by arguing that a defendant who simply associates with a "legal entity enterprise" does not impliedly authorize unforeseeable criminal acts to be committed on his behalf. This kind of enterprise, it is posited, differs from an "association in fact enterprise," in which the defendant may not know of the specific act, but is aware of the overall scheme because he chose to associate with a criminal enterprise. *See United States v. Castellano,* 610 F.Supp. 1359, 1400–02 (S.D.N.Y.1985). We are asked to conclude from this that because Schultz did not participate in or authorize the obstruction of justice, he should not have been held responsible for that crime. The argument fails because Schultz was neither charged nor convicted of conspiring to obstruct justice. Rather, he was convicted of participating in the criminal enterprise through his own criminal acts—the same enterprise in which Murphy participated through her criminal acts. The pivotal issue here is joinder. We hold that the indictment did not improperly join the counts against Marc Schultz with the obstruction of justice count against Maureen Murphy and Norman Teitler and that it was proper to combine all the counts for the purpose of a single trial.

■ Even if joinder had been improper, the Supreme Court has held that misjoinder in violation of Fed.R.Crim.P. 8(b) will not result in a reversal of the conviction if the misjoinder amounts to harmless error. *United States v. Lane,* — U.S. —, 106 S.Ct. 725, 729–32, 88 L.Ed.2d 814 (1986). The inquiry to be made is whether misjoinder caused prejudice because it "had substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946); *see Lane,* 106 S.Ct. at 732; *United States v. Carson,* 702 F.2d 351, 362 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2457, 77 L.Ed.2d 1335 (1983).

The evidence against the appellant Schultz is certainly strong. See *Lane,* 106 S.Ct. at 732. He was the law firm's trial counsel for four and one half years. Many of the events at issue took place during that time. The law firm with which he was associated was small and the likelihood of his awareness of firm practice was commensurately high. Further, witnesses testified that Schultz counseled them to testify falsely in judicial proceedings in support of the false medical bills supplied by Dr. D'Javid. Later, aware of the false bills supplied by D'Javid, Schultz signed an affidavit in support of restoring D'Javid's medical license, which had been revoked.

That affidavit characterized D'Javid as a "very conscientious and dedicated physician."

Schultz contends that he was prejudiced by "spill-over" evidence. However, the evidence of obstruction was clearly relevant only to Murphy. Because only three defendants were on trial, we believe the jury was able to consider the evidence of the grand jury tampering separately, as instructed. *See Carson*, 702 F.2d at 363; *United States v. Ricco*, 549 F.2d 264, 271 (2d Cir.), *cert. denied*, 431 U.S. 905, 97 S.Ct. 1697, 52 L.Ed.2d 389 (1977). Chief Judge Weinstein instructed the jury that

> [t]here is no evidence that Marc Schultz or Jay Teitler had anything at all to do with the obstruction of justice count and you may not consider that count in determining the guilt or innocence of Marc Schultz or Jay Teitler on any charge in the case.

The jury is presumed to have heeded this instruction. *See United States v. Rivera*, 496 F.2d 952, 953 (2d Cir.1974). Therefore, even if joinder had been improper, in our view, the error would have been harmless.

### B. Count Seven: Schultz's Representation of Hanousek

■ Schultz contends that the government effectively amended count seven of the indictment which charged mail fraud in connection with Schultz's representation of Hanousek. Schultz claims that the indictment charges that he counseled Hanousek to testify falsely regarding Dr. D'Javid's medical services. The government, Schultz contends, shifted its theory at trial and tried to prove that he settled a lawsuit based on a false medical bill. This is an amendment of the indictment, it is claimed, which violates the Fifth Amendment's guarantee to be tried only on charges contained in an indictment returned by a grand jury. Further, Schultz claims that the government failed to prove count seven beyond a reasonable doubt.

In formulating his argument, Schultz has misperceived count seven of the indictment and has lost sight of the record as a whole,

*see United States v. Weiss*, 752 F.2d 777, 788 (2d Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985). Count seven sets forth the scope of the charged fraudulent scheme employed in Hanousek's case. The indictment charges that Schultz "counseled William Hanousek to testify falsely regarding medical services purportedly rendered to him by the defendant ISMAIL F. D'JAVID," and that the "third-party action was settled by the defendants NORMAN E. TEITLER and MARC SCHULTZ, and on or about April 9, 1980 a settlement draft in the amount of $2250 was mailed to the offices of the Teitler firm." Thus, the indictment alleges both that Schultz counseled Hanousek to testify falsely and that Norman Teitler and Schultz settled the lawsuit based on the false bill. Furthermore, the jury had sufficient evidence to convict Schultz on this count. The government presented evidence that in preparing Hanousek for trial of his personal injury claim, Schultz showed him D'Javid's medical bill; Hanousek announced that he would not testify concerning it because the bill was false; Schultz replied "[y]ou really worry me Reverend." Schultz then met with Norman Teitler and thereafter told Hanousek that the case was or would be settled. Similarly, prior to Hanousek's preparation, Schultz had been told by McCurdy that McCurdy's D'Javid bill was false. Based on the foregoing, a reasonable juror could conclude that Schultz was aware of the fraudulent scheme charged and sought to employ it.

■ Next, Schultz argues that he did not commit a crime by settling the case because not to do so would somehow have disclosed a confidential communication of his client. Appellant cites *Whiteside v. Scurr*, 744 F.2d 1323, 1327–31, *reh'g denied*, 750 F.2d 713, 714 (8th Cir.1984), for this proposition. However, even if the principles enunciated by the Eighth Circuit in *Whiteside* applied to Schultz's conduct, this argument would fail because the Supreme Court reversed *Whiteside* after this appeal was argued. *Nix v. Whiteside*, — U.S. —, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986). The Court held that a lawyer has a

duty to prevent and to disclose frauds on the court and may disclose confidential communications to do so. *Id.* at 995–96. Thus, the Eighth Circuit's *Whiteside* rule no longer stands. In any event, it was the lawyer, not the client, who sought to promote false testimony herein.

### C. The Admission of the Out-of-Court Statements of Co-Conspirators

 Marc Schultz complains that the district court allowed the admission of Dunbar's testimony concerning statements made to him by co-conspirators regarding some of the firm's fraudulent practices. Schultz argues for the adoption in this circuit of the co-conspirator hearsay rule of *United States v. Inadi,* which required the government to establish the unavailability of the out-of-court declarant. 748 F.2d 812 (3d Cir.1984). However, the Supreme Court has reversed *Inadi* and has held that the Confrontation Clause imposes no such burden. *United States v. Inadi,* —— U.S. ——, 106 S.Ct. 1121, 1125–29, 89 L.Ed.2d 390 (1986). Thus, the evidence was properly admitted under Fed.R.Evid. 801(d)(2)(E), which allows the admission of out-of-court declarations made by co-conspirators during the course and furtherance of a conspiracy.

We have considered the appellants' other arguments and we find them to be without merit. To the extent that the arguments of each appellant have been asserted by the other, they are without merit. For the foregoing reasons, we affirm the judgments of conviction.